Filed 4/10/25  P. v. Gallegos CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> RODOLFO GALLEGOS, <br><br> Defendant and Appellant. | B328992 <br><br> (Los Angeles County Super. Ct. No. PJ53988) |

APPEAL from an order of the Superior Court of Los Angeles County, Mario Barrera, Judge.  Conditionally reversed with directions.

Bess Stiffelman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Michael C. Keller and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

This is Rodolfo Gallegos's third appeal since he was convicted of murder and attempted murder in 2012 after a shooting Gallegos committed in 1991, when he was 16 years old. Immediately after the shooting Gallegos fled to Mexico, where he remained for 18 years until his extradition. Gallegos appealed from his judgment of conviction, and we affirmed, but twice directed the court to resentence him. In our last opinion we directed the juvenile court to hold a transfer hearing under Welfare and Institutions Code section 707.[1] The juvenile court held that hearing, found Gallegos was not amenable to rehabilitation in the juvenile court system, and transferred him back to the criminal court.[2] Gallegos appeals from that order.

While his appeal was pending, the Legislature amended two statutes that affect the exercise and scope of the juvenile court's jurisdiction over former minors like Gallegos. Those amendments apply retroactively because one of them stated it did, both of them are ameliorative, and Gallegos's judgment was not yet final when they went into effect. Because in transferring Gallegos's case to criminal court the juvenile court did not clearly indicate it would not have exercised its discretion under one of

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

[2]     Courts often refer to such a court as "adult court" or "adult criminal court." (See, e.g., *In re J.S.* (2024) 105 Cal.App.5th 205, 208; *People v. Ochoa* (2020) 53 Cal.App.5th 841, 846.) In this opinion we distinguish the "criminal court" for adults from the "juvenile court" for minors and former minors over whom a juvenile court has jurisdiction.

the two new statutes, we direct the juvenile court to conduct another transfer hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Gallegos Shoots at People in a Car, Killing One and Injuring Two*

Late one night in August 1991 five people were in a car returning home from a party. As the car was stopped at a traffic light, a white car pulled up, and someone yelled the gang challenge, "Where are you from?" One of the passengers in the other car shouted back they were "from nowhere," which meant they did not belong to any gang. Gallegos, who was in the white car, fired several shots into the other car. (*People v. Gallegos* (Oct. 19, 2021, B301515) [nonpub. opn.] (*Gallegos II*); see *People v. Gallegos* (June 17, 2013, B238571) [nonpub. opn.] (*Gallegos I*).) One person in the other car was killed, and two were injured. (*Gallegos II*, *supra*.)

Gallegos was a member of the Blythe Street criminal street gang and had "BST" tattooed across his chin and another BST tattoo on his right forearm. (*Gallegos I*, *supra*, B238571.) After the incident Gallegos told several fellow gang members that he committed the shooting and that he made a mistake because his victims were not members of a gang. (*Ibid.*) Gallegos fled to Mexico, and in 2006 detectives applied to have Gallegos extradited. (*Gallegos II*, *supra*, B301515; see *Gallegos I, supra*, B238571.)

The People charged Gallegos with one count of murder (Pen. Code, § 187, subd. (a)) and four counts of attempted murder (Pen. Code, §§ 187, subd. (a), 664). The People alleged, among

3

other things, that Gallegos committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members, within the meaning of Penal Code section 186.22, subdivision (b), and that he personally used a firearm in committing the crimes, within the meaning of Penal Code section 12022.5, subdivision (a). (*Gallegos II*, *supra*, B301515; *Gallegos I*, *supra*, B238571.)

B. *A Jury Convicts Gallegos, the Trial Court Sentences Him Twice, and We Conditionally Reverse the Judgment for a Transfer Hearing in Juvenile Court*

The jury convicted Gallegos on all counts and found the gang and firearm allegations true. (*Gallegos II*, *supra*, B301515.) In January 2012 the trial court sentenced Gallegos to a prison term of 25 years to life for the murder conviction, plus five years for the firearm enhancement,[3] and four consecutive life terms, each with a minimum parole eligibility of 15 years, for the attempted murder convictions. (*Ibid.*; *Gallegos I*, *supra*, B238571.)

In June 2013 we affirmed Gallegos's convictions. However, we directed the trial court to reconsider his sentence, which we concluded was "the 'functional equivalent' of a life without possibility of parole sentence," under the Supreme Court's

---

[3]     When Gallegos committed his crimes, Penal Code section 12022.5, subdivision (a), provided for an enhancement of three, four or five years. The Legislature subsequently amended Penal Code section 12022.5, subdivision (a), to provide for an enhancement of three, four or 10 years. (See *People v. Davis* (1995) 41 Cal.App.4th 367, 374 & fn. 3.)

4

decision in *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*). (*Gallegos I, supra*, B238571.) After almost six years of proceedings, the trial court in 2019 resentenced Gallegos and imposed the same sentence. (*Gallegos II, supra*, B301515.)

Meanwhile, however, Proposition 57 went into effect. (See Public Safety and Rehabilitation Act of 2016, Ballot Pamp., Gen. Elec. (Nov. 8, 2016) text of Prop. 57.) That measure repealed statutory provisions that had permitted the district attorney to file certain cases involving juveniles directly in criminal court. On appeal after his resentencing, Gallegos argued, the People conceded, and we agreed Proposition 57 applied retroactively to all cases not final when the voters passed the initiative in 2016. (See *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 304 (*Lara*); *Gallegos II, supra*, B301515.) Although the trial court sentenced Gallegos in 2012, we had directed the trial court to resentence him, which did not occur until September 2019. Thus, we concluded, Gallegos was entitled to a new transfer hearing in the juvenile court to determine whether the court would have transferred Gallegos to criminal court.

C. *The Juvenile Court Grants the Motion To Transfer, and Gallegos Appeals*

The People filed a petition under section 602 asking the juvenile court to declare Gallegos a ward of the court and a motion under section 707 to transfer Gallegos to criminal court. At the conclusion of a four-day hearing in March 2023 the juvenile court found by clear and convincing evidence Gallegos was "not amenable to remain in juvenile court." The court granted the motion to transfer and ordered Gallegos to appear in criminal court. Gallegos timely appealed.

**DISCUSSION**

A.    *Applicable Law*

"Section 707 sets forth the procedures for transferring a minor from juvenile court to criminal court.[4]  It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.'  [Citation.]  The prosecution bears the burden of proving that the minor should be transferred."  (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*); see § 707, subd. (a)(1); Cal. Rules of Court, rule 5.770(a).)

The Legislature amended section 707 in 2023 and 2024. Effective January 1, 2023, language added to section 707, subdivision (a)(3), states that, to find a minor should be transferred to criminal court, the juvenile court must find "by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (Stats. 2022, ch. 330 (Assem. Bill No. 2361), § 1.)  The amended statute also provides that, if the juvenile court transfers jurisdiction, "the court shall recite the basis for its decision in an order entered upon the minutes, which shall include the reasons

---

4    Under section 602 a "minor" is "anyone under the age of 18 years at the time of the commission of the offense." (*M.E. v. Superior Court* (2023) 88 Cal.App.5th 1199, 1205; see § 602, subd. (a).)  "Because the juvenile court's jurisdiction is based on age at the time of the violation of a criminal law or ordinance, '[i]t is therefore possible that a person might commit a murder at age 17, be apprehended 50 years later, and find himself subject to juvenile court jurisdiction at age 67.'" (*People v. Ramirez* (2019) 35 Cal.App.5th 55, 66.)  Something like that happened here.

6

supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (*Ibid.*; see § 707, subd. (a)(3).) The amendments "changed the procedure for ordering a juvenile transfer in three material ways, by (1) raising the prosecution's burden of proof, (2) requiring a new specific finding regarding amenability to rehabilitation, and (3) requiring the court to state the reasons supporting a finding that the minor is not amenable to rehabilitation." (*In re J.M.* (2024) 103 Cal.App.5th 745, 752, review granted Sept. 25, 2024, S286259; see *In re E.P.* (2023) 89 Cal.App.5th 409, 416.) These provisions were in effect at the time of Gallegos's transfer hearing.[5]

In determining whether a minor is amenable to rehabilitation under the juvenile court's jurisdiction, the juvenile court must consider five criteria: (1) "[t]he degree of criminal sophistication exhibited by the minor"; (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; (3) "[t]he minor's previous delinquent history"; (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor"; and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707, subd. (a)(3)(A)-(E).) "The statute also sets forth a nonexhaustive list of relevant factors for the juvenile court to consider with respect to each of the five criteria." (*In re J.S.* (2024) 105 Cal.App.5th 205, 212; see § 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).) "Effective January 1, 2024, Senate Bill 545 amended section 707 to require that with respect to each

---

[5] After Gallegos's transfer hearing the Judicial Council revised rule 5.770 of the California Rules of Court to reflect the changes to section 707.

of [the] five criteria the juvenile court 'shall give weight to any relevant factor,' including the specific factors listed as relevant to each criterion. [Citations.] The previous version of the statute made consideration of those factors discretionary, not mandatory." (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 164-165.)[6]

Although the juvenile court must consider all enumerated criteria and give weight to any relevant factor, no criterion or factor is dispositive. (See *Miguel R.*, *supra*, 100 Cal.App.5th at p. 166 [section 707 "requires the court to consider all five criteria in making its determination, but the statute says nothing about the relative weight to be given to any of the criteria"].) Thus, "the court has the discretion to conclude that one or more of the five factors predominate so as to determine the result, even though some or all of the other factors might point to a different result." (*In re E.P.*, *supra*, 89 Cal.App.5th at p. 417.)

B.    *Relevant Proceedings*

Gallegos argues we should direct the juvenile court to conduct a new transfer hearing because legislative amendments to the scope of the juvenile court's jurisdiction and commitment options for former minors apply retroactively, and because it is unclear whether the juvenile court would have granted the

---

[6]    "With respect to the degree of criminal sophistication, Senate Bill 545 also added new mandatory factors for the court to consider: whether the minor has had any involvement in the child welfare or foster care system and whether the minor has been 'a victim of human trafficking, sexual abuse, or sexual battery.'" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165; § 707, subd. (a)(3)(A)(ii); see Stats. 2023, ch. 716, § 1.) Gallegos concedes this amendment is not relevant to his appeal because there was no evidence concerning these factors.

8

motion to transfer under its new, discretionary authority. Because Gallegos's argument involves only the second criterion under section 707, subdivision (a)(3)—whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction—we discuss only the evidence at the transfer hearing and the court's decision on that criterion.

### 1. *The Evidence at the Transfer Hearing*

At the hearing the People submitted testimony on the second criterion from a juvenile probation officer. Gallegos submitted testimony and reports from a clinical psychologist and the chief operating officer of an organization that helps prisoners, including former minors, prepare for reentry into the general population.

*Juvenile probation officer.* The juvenile probation officer submitted a report that reviewed the five criteria under section 707, subdivision (a)(3). Regarding the second criterion, the probation officer's report stated Gallegos was "well beyond the age of juvenile jurisdiction and services" because he fled to Mexico and was a fugitive from justice for almost 20 years. The probation officer testified neither she nor her supervisor was aware of any programs under the juvenile court system to rehabilitate a 48-year-old adult convicted of murder and four attempted murders. The probation officer stated she understood that, at the time of the hearing, a youthful offender could be detained in a secure youth treatment facility until age 25 and that the programs at such facilities were designed for people up to that age. (See § 875, subd. (c)(1)(A).) The probation officer also testified there were no services under the juvenile court's jurisdiction to rehabilitate a 48-year-old man. She said she was

not aware of any former juveniles over the age of 25 who were rehabilitated under the juvenile court's jurisdiction.

*Clinical psychologist.* Dr. Rahn Minagawa, a clinical and forensic psychologist, testified for Gallegos. He interviewed Gallegos twice and reviewed certain police reports, prison records, letters from former employers, letters of support from friends and family, reports of other expert witnesses who testified on behalf of Gallegos, and a mitigation report from 2016 or 2017 prepared by an investigator for the defense in connection with Gallegos's resentencing hearing.

Regarding the second criterion under section 707, subdivision (a)(3), Dr. Minagawa said Gallegos had shown he had already grown and matured by leading a "crime-free" life for 31 years. He said Gallegos told him that he worked as an apprentice to a mechanic in Mexico, taught English to students of all ages, and was not involved in any gang activities in Mexico. According to Dr. Minagawa, the mitigation report from Gallegos's resentencing hearing included information from several members of Gallegos's family living in Mexico, who corroborated Gallegos's statements about his work history and lack of gang activity in Mexico. Dr. Minagawa admitted that he did not attempt to verify the information in the report, but stated that there was no evidence Gallegos committed a crime in Mexico. Dr. Minagawa said several incidents where Gallegos violated jail and prison rules during his incarceration did not suggest Gallegos could not be rehabilitated.

Based on this information, Dr. Minagawa stated his opinion Gallegos could be rehabilitated in the time remaining under the juvenile court's jurisdiction. Dr. Minagawa also testified that, in his opinion, Gallegos was already rehabilitated

10

because he had not engaged in any criminal activity or been involved in a gang since the 1991 shooting. (On cross-examination Dr. Minagawa acknowledged Gallegos was a member of a prison gang for some period of time after his extradition.) Dr. Minagawa understood "rehabilitation" meant a person recognized and acknowledged his or her behavior, showed remorse for it, and was no longer a danger to the community.

Dr. Minagawa faulted the probation officer's assessment of the second criterion because, according to Dr. Minagawa, she failed to account for Gallegos's ability to grow and mature and wrongly stated the juvenile court had no programs to offer older former minors. According to Dr. Minagawa, other counties (he could not "speak to" Los Angeles County) "have indicated that they are working with older individuals either through their adult probation department in conjunction with their juvenile probation department or are turning to programs outside, as long as the person is not presently a risk to the community."

*Placement and treatment programs.* Barry Lindstrom of Amity Foundation, a nonprofit corporation that serves men and women reentering the general population after incarceration, also testified for Gallegos. Lindstrom testified Amity could provide Gallegos housing if he were "conditionally released or released on community supervision." He said Amity had a new contract with the Board of State and Community Corrections that allowed the foundation to house people of any age on probation or discharged from the Division of Juvenile Justice for up to one year.[7] At the

---

[7] The Legislature closed the Division of Juvenile Justice effective June 30, 2023 and "shift[ed] responsibility for all youth adjudged a ward of the court . . . to county governments."

end of that year, Lindstrom said, Amity can place people in "transitional housing."

Lindstrom testified the placement he had in mind for Gallegos housed 184 men and had correctional officers "for rehabilitation work on site," a "parole agent," a "correctional counselor," job placement assistance, and "whatever programs are required by the court." Up to that point in time, however, Lindstrom said Amity operated those programs under the jurisdiction of the criminal court. Lindstrom said the oldest former minor receiving services from Amity under the juvenile court's jurisdiction was 28 or 29 years old.

> 2. *The Juvenile Court Finds Gallegos Is Not Amenable to Rehabilitation Before the Court's Jurisdiction Expires*

The court found Gallegos was not amenable to rehabilitation before the juvenile court's jurisdiction expires. The court reached this conclusion in two ways. First, the court interpreted section 607 to bar the court from exercising jurisdiction over Gallegos beyond the initial jurisdiction it had to adjudicate the transfer hearing.[8] At the time of the transfer hearing, only section 607, subdivision (c), addressed

---

(§ 736.5, subds. (a), (e).) Gallegos's transfer hearing took place in March and April 2023, when the Division of Juvenile Justice was still operating.

[8] See *M.E. v. Superior Court* (2023) 88 Cal.App.5th 1199, 1205 (juvenile court has initial jurisdiction to determine whether to retain jurisdiction over a minor); *People v. Ramirez* (2019) 35 Cal.App.5th 55, 66 (same).

12

commitments for former minors up to and possibly beyond 25 years old.[9] That provision allows the juvenile court to retain jurisdiction over a ward who committed murder "until that person attains 25 years of age, or two years from the date of commitment to a secure youth treatment facility pursuant to Section 875, whichever occurs later . . . ." The court interpreted section 607, subdivision (c), to preclude committing a person over the age of 25 to a secure youth treatment facility; thus, the court stated, the two-year jurisdiction extension following such a commitment under section 607, subdivision (c), could "never begin." (See § 875, subd. (c)(1)(A).)

Second, even assuming the court could retain jurisdiction over Gallegos for two years under section 607, subdivision (c) (as Gallegos argued), the court found the programming and treatment offered in secure youth treatment facilities were not designed for 48-year-old men. The court also explained that releasing Gallegos directly to Amity would bypass a number of procedural steps required by section 875. Finally, even if section 875 permitted the court to place Gallegos with Amity, the court said "there's no evidence [Amity] is ready or would provide any services or counselling or therapy" for Gallegos. The court found Amity was a "step-down facility" for "transitional housing" that was not designed to provide in-house services.

Regarding Gallegos's argument he was already rehabilitated, the juvenile court said it would not "expand the criteria" under section 707, subdivision (a)(3), to include whether the minor "has in fact been rehabilitated." The court stated: "It

---

[9] Other than "continued detentions" under section 876, which does not apply here.

13

is clear that the Legislature never thought that this [criterion] . . . would be applied to a case of a 48-year-old man."

C. *Subsequent Legislative Changes Apply Retroactively, and One of Them Requires a New Transfer Hearing*

1. *Senate Bill No. 135 and Assembly Bill No. 134 Clarified the Scope of the Juvenile Court's Jurisdiction and Expanded Commitment Options for Former Minors*

As summarized, section 607, subdivision (c), authorized the juvenile court to retain jurisdiction over a ward who committed an offense listed in section 707, subdivision (b) (including murder), until that person was 25 years old, or two years from the date of commitment to a secure youth treatment facility under section 875, whichever is later, if the person, at the time of adjudication, would, in criminal court, have faced an aggregate sentence of seven years or more. While that provision remains unchanged, Senate Bill No. 135 (Sen. Bill 135) created a new provision, section 607, subdivision (d), effective September 13, 2023, to clarify the juvenile court can retain jurisdiction over a ward who committed an offense listed in section 707, subdivision (b), "who is 25 years of age or older for a period not to exceed two years from the date of disposition." (Stats. 2023, ch. 190 (Sen. Bill 135), §§ 12, 14; Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 135 (2023-2024 Reg. Sess.) as amended Aug. 28, 2023, p. 3 [the bill "[c]larifies jurisdiction for juvenile courts in cases where a person committed a serious crime as a minor, but is now over 25 years of age, which may arise due to resentencing efforts or cold cases, among other

14

reasons"].)[10]  Thus, the two-year extension of juvenile court jurisdiction is no longer dependent on a minor's commitment to a secure youth treatment facility and applies to persons older than 25 years of age.  The new section 607, subdivision (d), also provides:  "The court shall exercise jurisdiction in conformance with the objectives of the juvenile court."  (Stats. 2023, ch. 190, *supra*, § 12.)  And Sen. Bill 135 states its amendments to section 607 apply retroactively.  (*Ibid.*; see § 607, subd. (m).)

Assembly Bill No. 134 (Assem. Bill 134) amended section 875, effective July 10, 2023, to add subdivision (j), which states:  "A person who is 25 years of age or older shall not be committed to or detained in a county juvenile facility, unless the court finds that such a commitment or detention is in the best interest of that person and does not find that it would create a risk to the other youth in the juvenile facility.  A juvenile court exercising jurisdiction over a person who is 25 years of age or older may order commitment or detention of the person into an adult facility, including a jail or other facility established for the confinement of adults, or into a less restrictive program, as defined in subdivision (f), if the person is otherwise eligible for that program."  (See Stats. 2023, ch. 47 (Assem. Bill 134), § 30.)  Thus, new section 875, subdivision (j), expanded commitment options for former minors who at disposition are 25 years and older beyond secure youth treatment facilities to include facilities "established for the confinement of adults."  Assem. Bill 134 did not specify whether its amendments apply retroactively.

---

[10]  Former section 607, subdivision (d), was renumbered section 607, subdivision (e).  (Stats. 2023, ch. 190, *supra*, § 12.)

## 2. *The Amendments Under Sen. Bill 135 and Assem. Bill 134 Apply Retroactively*

"'The Legislature ordinarily makes laws that will apply to events that will occur in the future.  Accordingly, there is a presumption that laws apply prospectively rather than retroactively.  But this presumption against retroactivity is a canon of statutory interpretation rather than a constitutional mandate.  [Citation.]  Therefore, the Legislature can ordinarily enact laws that apply retroactively, either explicitly or by implication." (*Lara*, *supra*, 4 Cal.5th at p. 307.)  An inference of retroactivity applies where statutory amendments create the "possibility of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult," which "can result in dramatically different and more lenient treatment." (*Id.* at p. 303; see *Miguel R.*, *supra*, 100 Cal.App.5th at pp. 169-170 [ameliorative amendments to section 707 apply retroactively to a nonfinal judgment].)  Where a judgment of conviction is not final, an "amendatory act" imposing lighter punishment or resulting in more lenient treatment can be applied constitutionally to acts committed before its passage. (*Lara*, at p. 307; see *In re Estrada* (1965) 63 Cal.2d 740, 745.)

Gallegos argues, the People concede, and we agree the amendments to section 607 creating subdivision (d) apply to Gallegos because Sen. Bill 135 states the amendments to section 607 apply retroactively, the amendments are ameliorative, and the judgment is not yet final.  Gallegos also argues, the People conceded at oral argument, and we agree new section 875, subdivision (j), applies retroactively because it is an ameliorative change in the law.  Section 875, subdivision (j), does not directly provide for more lenient treatment of former minors, but in

16

tandem with section 607, subdivision (d), it creates new commitment and detention options for defendants 25 years old and older to be rehabilitated within the juvenile justice system. Without those options, juvenile courts may find older former minors not amenable to rehabilitation while under the jurisdiction of the juvenile court solely because there are no appropriate options for their commitment. Thus, the addition of section 875, subdivision (j), "ameliorated the possible punishment for a class of persons" (*Lara, supra*, 4 Cal.5th at p. 308), namely former minors 25 years of age and older. (See *In re S.S.* (2023) 89 Cal.App.5th 1277, 1289 [amendments to section 707 applied retroactively to nonfinal judgments because they "make it more difficult to transfer juveniles from juvenile court, which . . . reduces the possible punishment for juveniles"].)

### 3. *Assem. Bill 134 Requires Remand*

Where the Legislature enacts ameliorative legislation after a defendant has been sentenced, "a limited remand is appropriate . . . for the sole purpose of allowing the trial court to consider whether to exercise its newly conferred discretion." (*People v. Mataele* (2022) 13 Cal.5th 372, 437; see *People v. Lynch* (2024) 16 Cal.5th 730, 777 [directing that "[f]urther proceedings on remand are to be conducted in accordance with the current statutory requirements" of new ameliorative sentencing legislation]; *People v. Morelos* (2022) 13 Cal.5th 722, 727 [directing "the trial court to consider whether to exercise its newly conferred discretion under" under two recent ameliorative sentencing statutes].) Such a remand is appropriate absent "a clear indication that the trial court" would not have exercised its discretion under the new legislation. (*Mataele*, at p. 437.)

17

Gallegos argues the juvenile court found him not amenable to rehabilitation before the court's jurisdiction expired because "the court concluded jurisdiction had already expired such that it could not provide any supervision or services." But that was only one basis for the juvenile court's finding. The court made the same finding under Gallegos's theory the court had two years of jurisdiction over Gallegos, which is what Sen. Bill 135 now clarifies. There is no need to remand on this issue.

Gallegos also argues the juvenile court did not believe existing law gave it discretion to place Gallegos with Amity or "another appropriate facility."[11] We agree with Gallegos the juvenile court's decision does not "'"clearly indicate"'" (*People v. Salazar* (2023) 15 Cal.5th 416, 419) whether the court would have found Gallegos unamenable to rehabilitation within two years had the court known it could have committed Gallegos to "an adult facility, including a jail or other facility established for the confinement of adults," as provided under new section 875, subdivision (j). The juvenile court believed the then-existing options—including a secure youth treatment facility and possibly Amity's nascent program—were not appropriate placements for a 48-year-old man. But the People did not present any evidence concerning rehabilitative options for Gallegos in an adult facility (because none was available at the time of the transfer hearing), and the court did not consider any such options other than Amity,

_____

[11] Gallegos argues there are now "expanded programs" for former minors like him, and he asks us to take judicial notice of disposition orders in five juvenile court cases involving former minors that purportedly identify the types of programs Gallegos claims now exist. We deny Gallegos's request for judicial notice of those orders as unnecessary.

18

which the court found unsuitable for various reasons.  (Cf. *Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 200 [vacating an order transferring a minor to criminal court where the People offered "little if any evidence to demonstrate what [the minor's] rehabilitative needs were, much less why they could not be met through a [juvenile] commitment"]; *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 722 [juvenile court erred in transferring a minor to criminal court where there was no evidence existing programs were unlikely to result in the minor's rehabilitation].)  Under section 875, subdivision (j), juvenile courts have new options for committing former minors, including a wider range of adult facilities and jail.  On remand the court will have the opportunity to consider those options in determining whether Gallegos can be rehabilitated within the two years the juvenile court can exercise jurisdiction over him.

Although the People do not address Assem. Bill 134, they contend in connection with Gallegos's argument regarding Sen. Bill 135 that remand would be futile because the juvenile court found three of the remaining four factors under section 707, subdivision (a)(3), indicated Gallegos was not amenable to rehabilitation under the juvenile justice system.  But the juvenile court did not state whether it gave more weight to any criteria than the others or that it would have found Gallegos unamenable to rehabilitation even if it found under the second criterion he could be rehabilitated within two years of juvenile court jurisdiction.  (See *Miguel R., supra,* 100 Cal.App.5th at pp. 166-167 [even if a juvenile court finds under the second criterion of section 707, subdivision (a)(3), a minor is amenable to rehabilitation before the court's jurisdiction expires, the court can still make the ultimate finding the minor is not amenable to

19

rehabilitation "'while under the jurisdiction of the juvenile court'".)  We cannot speculate about what the juvenile court would have done had it known the scope of its discretionary powers at the time of the transfer hearing and determined the second criterion weighed in favor of amenability to rehabilitation within the juvenile justice system.  Thus, the appropriate remedy is to direct the juvenile court to conduct a new transfer hearing. (*People v. Salazar*, *supra*, 15 Cal.5th at p. 425.)

## DISPOSITION

The order is conditionally reversed, and the juvenile court is directed to hold a new transfer hearing.  If the juvenile court transfers Gallegos to criminal court, the criminal court must reinstate his convictions and sentence.  If the juvenile court does not transfer Gallegos, the court must treat the convictions as juvenile adjudications and impose an appropriate disposition. Gallegos's request for judicial notice is denied.


SEGAL, Acting P. J.

We concur:



FEUER, J.



STONE, J.


20